STATE of Iowa, Appellee,

v.

Maurice Tyrone MOORE, Appellant.

No. 89–1647.

Court of Appeals of Iowa.

Feb. 26, 1991.

Linda Del Gallo, Acting State Appellate Defender, and Ahmet S. Gonlubol, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Ann E. Brenden, Asst. Atty. Gen., James Metcalf, County Atty., and Thomas Ferguson, Asst. County Atty., for appellee.

Heard by DONIELSON, P.J., and HAYDEN and HABHAB, JJ.

HAYDEN, Judge.

A convenience store clerk was robbed by a black man who held his hand in his pocket and said he had a gun there. The clerk never actually saw the gun. The robber took slightly over $200 in cash.

The clerk reported the robbery, and officers arrived at the convenience store to investigate. During the investigation a police radio was placed on a counter near the clerk. The clerk heard a report on this radio a suspect in the robbery had been apprehended, the suspect acted suspiciously and had tried to flee, and he had slightly over $200 in cash on his person.

Shortly after the clerk heard this radio report, and within two hours after the robbery, police brought the defendant, Maurice Moore, to the convenience store for a "show-up" identification. Moore's hands were in handcuffs, and he was the only black person present. The clerk identified Moore as the robber.

Moore was charged with the crime of robbery in the second degree while representing he was in the immediate possession and control of a firearm. A jury found him guilty. He appeals. We affirm.

Moore contends the district court erred by sustaining the State's challenge for cause of one of the two black jurors after the jury had been sworn and testimony began. The juror voluntarily informed the court attendant she was related to Moore by marriage. Her brother was Moore's uncle, being married to Moore's maternal aunt. The juror also was acquainted with Moore's mother, and was a casual friend.

The trial court seated one of the two alternates in Mrs. Jackson's place. The record reflects the alternates had been present with the jury since the start of the trial.

Moore also contends the district court should have suppressed evidence resulting from the store clerk's "show-up" identification of Moore as the robber.

Our scope of review is on assigned errors of law. Iowa R.App.P. 4.

## I. Striking of Juror

The integrity of our criminal jury system is really the central issue before us. He claims the trial court's action deprived him of a constitutionally-mandated representative cross-section of the population. See Batson v. Kentucky, 476 U.S. 79, 87, 106

S.Ct. 1712, 1718, 90 L.Ed.2d 69, 80–81 (1986). Moore further contends the evidence does not support the challenge for cause striking of the juror.

■ We first point out the trial court has broad discretion in deciding challenges to jurors. State v. Grove, 171 N.W.2d 519, 520 (Iowa 1969). Additionally:

[T]he State is entitled to the same judicial impartiality and fairness as any other litigant in our courts ... Justice requires 'a fair opportunity for each side to present its case must be afforded.' [Citations omitted.]

State v. Ailts, 433 N.W.2d 765, 766 (Iowa App.1988) (quoting State v. Lunden, 297 N.W.2d 232, 235 (Iowa App.1980).

■ Generally, failure to challenge a juror until after the jury has been sworn constitutes a waiver of any challenges as to that juror's qualifications. See Turner v. Jones, 215 N.W.2d 289, 290–91 (Iowa 1974); State v. Grove, 171 N.W.2d 519, 520 (Iowa 1969). However, these objections must have been open to discovery during voir dire. Turner, 215 N.W.2d at 290–91; Grove, 171 N.W.2d at 520. In this case, the prosecutor did ask if any prospective jurors knew or were related to the defendant. No one replied. Thus, we determine, as did the trial court, there has been no waiver of the challenge, as Mrs. Jackson did not answer the prosecutor's question.

■ We turn now to Moore's main argument, concerning a representative cross-section of the community sitting on the jury.

"The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds."

Batson, 476 U.S. at 86, 106 S.Ct. at 1717, 90 L.Ed.2d at 80–81 (quoting Strauder v. West Virginia, 100 U.S. 303, 308, 25 L.Ed. 664, 666 (1880).

Moore is a black defendant. Mrs. Jackson, the struck juror, was also black. After Mrs. Jackson was struck and the alter-

nate juror seated, only one black person remained on the jury. Apparently Moore thinks a juror who well could be biased should be left on the jury if both that person and the defendant are of a racial minority. This flies in the face of established constitutional law.

> Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most noble. The law regards man as man, and takes no account of his surroundings or his color when his civil rights as guaranteed by the supreme law of the land are involved.

*Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Justice Harlan dissenting).

> In holding that racial discrimination in jury selection offends the Equal Protection Clause, the Court in Strauder [v. West Virginia] recognized, however, that *a defendant had no right to a "petit jury composed in whole or in part of persons of his own race."* "The number of our races and nationalities stands in the way or evolution of such a conception" of the demand of equal protection.

> \* \* \* \* \* \*

> The petit jury has occupied a central position in our system of justice by safeguarding a person accused of crime against the arbitrary exercise of power by prosecutor or judge. Those on the venire must be *"indifferently chosen,"* to secure the defendant's right under the Fourteenth Amendment to "protection of life and liberty against race or color prejudice."

> Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. *Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply "is unrelated to his fitness as a juror."* As long ago as Strauder, therefore, the court recognized that by deny-

ing a person participation in jury service on account of his race, the state unconstitutionally discriminated against the excluded juror.

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is a "stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others."

> \* \* \* \* \* \*

> While decisions of this Court have been concerned largely with discrimination during selection of the venire, the principle announced there also forbid discrimination on account of race in selection of the petit jury.

*Batson,* 476 U.S. at 86–88, 106 S.Ct. at 1717–18, 90 L.Ed.2d at 81–82 (citations omitted; emphasis added).

The recent United States Supreme Court case *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), dealt directly with the issue of jury composition and prosecutor preemptory challenges.

> We reject petitioner's fundamental thesis that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the "fair possibility" of a representative jury. While statements in our prior cases have alluded to such a "fair possibility" requirement, satisfying it has not been held to require anything beyond the inclusion of all cognizable groups in the venire, and the use of a jury numbering at least six persons. A prohibition upon the exclusion of cognizable groups through peremptory challenges has no conceivable basis in the text of the Sixth Amendment, is without support in our prior decisions, and would undermine

rather than further the constitutional guarantee of an impartial jury.

\* \* \* \* \* \*

The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does).... The fair-cross-section venire requirement assures, in other words, that in the process of selecting the petit jury the prosecution and defense will compete on an equal basis. [Emphasis in original opinion.]

But to say that the Sixth Amendment deprives the State of the ability to "stack the deck" in its favor is not to say that each side may not, once a fair hand is dealt, use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side. ... "We have never invoked the fair-cross-representation principle to invalidate the use of either *for-cause* or *preemptory* challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." ... "Defendants are not entitled to a jury of any particular composition." [Emphasis added.]

\* \* \* \* \* \*

It does not violate [the fair-cross-section] requirement, we said, to disqualify a group for a reason that is related "to the ability of members of the group to serve as jurors *in a particular case.*" The "representativeness" constitutionally required at the venire stage can be disrupted at the jury-panel stage to serve a State's "legitimate interest."

*Id.*, 493 U.S. at ——, 110 S.Ct. at 806–09, 107 L.Ed.2d at 916–18 (citations omitted).

It is important to understand Moore does not contend Mrs. Jackson was struck because she was black. Rather, the alleged error arose because in removing Mrs. Jackson, the jury ceased to be a representative cross-section of the community. In fact, Moore's trial counsel stated to the trial court he would acquiesce in the State's challenge for cause, except for the fact Mrs. Jackson was black.

In a recent case, the Iowa Supreme Court reiterated the criteria for showing racial discrimination in the jury selection process, including the use of peremptory challenges. By implication, the same standard applies to challenges for cause.

A defendant challenging the composition of a jury panel must first establish a prima facie violation of the sixth amendment's fair cross-section requirement. If a prima facie violation is established, the State has the burden of justifying this infringement by showing that the attainment of a fair cross section would be incompatible with a significant interest. A similar procedure has been provided in the case of a defendant claiming improper use of peremptory challenges to strike targeted segments of the community.

To establish a prima facie violation of the cross-section requirement, the defendant

must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systemic exclusion of the group in the jury-selection process.

*Duren [v. Missouri]*, 439 U.S. [357,] 364, 99 S.Ct. [664,] 668, 58 L.Ed.2d [579,] 586–87 [ (1979) ].

*State v. Watkins*, 463 N.W.2d 411, 414 (Iowa 1990).

The trial court went out of its way to ensure Moore received representative cross-section for jury selection. It exchanged an earlier all-white panel for one with a more representative racial mix. The record further reflects the court made its decision to strike Mrs. Jackson after serious consideration of the issues raised by trial defense counsel. There is no indication, nor does Moore assert, either the judge or the prosecutor were motivated by any racial bias.

The record reflects Mrs. Jackson is related by marriage to Moore. Mrs. Jackson's brother is Moore's uncle by marriage. Her brother is married to the sister of Moore's mother. Moore's mother and Mrs. Jackson are friends. Occasionally they have coffee or meet at the same social functions.

Mrs. Jackson stated these facts would be on her mind as she tried to decide Moore's guilt or innocence. Although she did think Moore's family would understand her actions as a juror, Mrs. Jackson mentioned "[t]here could be" retaliation against her if Moore was found guilty.

Mrs. Jackson volunteered this information on her own. Apparently when the jury was voir dired, she did not recall this specific familial relationship. It was only after the first witness testified she remembered the connection. It was then she came forward.

Mrs. Jackson's actions are profound testimony to the integrity and fairness of our jury system. She did not have to come forward with the information of her relation to the defendant. She could have stayed in the jury and worked surreptitiously to free her relative. Instead, she followed her conscience once she realized the relationship.

Our jury system, lauded the world over, once again exhibited the abiding commitment to justice and fairness in the hearts and minds of those who serve as jurors. The serious dedication to honesty, justice, fairness, and truth shown by Mrs. Jackson ensures the continued integrity and viability of our unique system of judgment by a jury of one's peers.

The trial court's sustaining of the challenge for cause is supported by substantial evidence. The trial court did not abuse its discretion. There is no evidence of any racially-motivated bias by either the trial judge or the prosecutor.

We affirm the trial court on this issue.

## II. *Impermissively Suggestive Identification*

■ Moore contends the "show-up" identification some two hours after the initial robbery was impermissively suggestive. He notes he was the only black person present, and he was in handcuffs. The clerk previously heard a police radio report the person in police custody had tried to flee and possessed about the amount of cash taken in the robbery.

In addition, Moore argues under these facts there was a substantial likelihood of irreparable misidentification from the suggestive procedure. He alleges the clerk had a limited opportunity to see the robber during the robbery. There were inconsistencies and uncertainties in the clerk's description of the robber and the robber's clothing.

The Iowa Supreme Court's holding in *State v. Holderness* is directly on point here.

Our analysis in this context is two-fold. We first consider whether an impermissively suggestive out-of-court identification procedure was employed. "If we find the procedure to be impermissibly suggestive, we must then determine whether, under the totality of the circumstances, the suggestive procedure gave rise to '*a very substantial likelihood of irreparable misidentification.*'"

We need not decide whether the out-of-court identification here involved an impermissible suggestive procedure, however, because we find the identification to be reliable under the totality of the circumstances; that is, there was not a "very substantial likelihood of irreparable misidentification." The factors to be considered in determining whether an identification was sufficiently reliable include

[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*State v. Holderness*, 301 N.W.2d 733, 738 (Iowa 1981) (citations omitted).

We have examined the facts surrounding the store clerk's "show-up" identification. Our review persuades us "there was not a 'very substantial likelihood of irreparable misidentification.'" *Id.*

The store was well-lit. The store clerk had been robbed two years before. He knew the need to obtain an accurate description of a robber. The clerk had ample opportunity to get a good look at the robber's face.

Additionally, the clerk's prior description of the robber was consistent with the description of Moore at the night of the robbery. The clerk identified the robber as being a black male in his mid-twenties. He described the robber as being about 260 pounds, about 5'9" or 5'10" in height. He reported the robber was wearing a gray sweatsuit and a gray jacket with blue trim.

In fact, Moore is a black male. He weighs about 270 pounds and is 5'11" tall. He was wearing a gray sweatsuit and a gray jacket with blue trim, worn inside out, when he was apprehended.

The clerk made the "show-up" identification only about two hours after the robbery. His memory would still be fresh. The store clerk was "100 percent" positive in his "show-up" identification. Additionally, the clerk's earlier experience with a robbery taught him to be attentive to details of the robber's appearance.

Based on our review of the totality of the circumstances, we hold the identification to be reliable. *See Holderness,* 301 N.W.2d at 738. We affirm the trial court on this issue.

We affirm the judgment of the trial court on all issues.

AFFIRMED.