# IN THE SUPREME COURT OF IOWA

No. 18–1298

Filed April 17, 2020

**STATE OF IOWA,**

Appellee,

vs.

**LEVI GIBBS III,**

Appellant.

---

Appeal from the Iowa District Court for Webster County, Thomas J. Bice, Judge.

A defendant appeals his conviction for second-degree murder, arguing that his Fifth Amendment privilege against self-incrimination was violated. **AFFIRMED.**

Ashley Stewart, Assistant Appellate Defender, and Levi Gibbs III, pro se, for appellant.

Thomas J. Miller, Attorney General, Timothy M. Hau and Coleman McAllister, Assistant Attorneys General, Darren Driscoll, County Attorney, and Ryan Baldridge, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This homicide case requires us to address another aspect of the recently enacted stand-your-ground legislation. A man was charged with murdering another man by firing a single fatal shot. Initially he denied involvement in the shooting, but at trial he asserted the defense of justification. Over the defendant's objection, the district court gave a jury instruction incorporating the terms of Iowa Code section 704.2B. Thus, the instruction included a statement that "[a] person using deadly force is required to notify or cause another to notify a law enforcement agency about his use of deadly force within a reasonable time period after the use of the deadly force." The defendant, who was convicted, claims that both section 704.2B itself and the jury instruction incorporating that section violated his Fifth Amendment rights.

On our review, we conclude that it invades the defendant's Fifth Amendment rights when a trial judge instructs the jury in a homicide case that the defendant was required to notify law enforcement of his or her use of deadly force. However, because the evidence of guilt in this case was overwhelming, we find the error to have been harmless beyond a reasonable doubt. Therefore, we affirm the defendant's conviction and sentence.

### II. Facts and Procedural History.

Around 3:34 a.m. on September 3, 2017, the defendant, Levi Gibbs III, shot and killed Shane Wessels. The shooting was captured on a law enforcement digital camera attached to a light pole at the scene. A contemporaneous 911 caller reported the shooting and identified Gibbs as the shooter. There were numerous eyewitnesses to the shooting.

Gibbs killed Wessels during a melee at a street intersection in Fort Dodge. Gibbs initiated the melee when he shoved Wessels and indicated he wanted to fight. Gibbs was "very angry." Gibbs and Wessels exchanged punches. Several other individuals joined in and attacked Wessels. Latricia Roby, Gibbs's sister, struck Wessels with a vodka bottle and later an extendable baton. Chassdie Mosley used a stun gun on Wessels.

Gibbs left the fracas and went to his vehicle to retrieve a gun. While Gibbs was retrieving his gun, Wessels, who had been beaten and knocked to the ground, picked himself up and said he was done with the fight. Wessels began to retreat. Gibbs then returned and shot Wessels. Wessels fell to the ground. Gibbs stood over the fallen Wessels and tried to shoot him again. This time, the gun jammed, and Gibbs instead hit Wessels with the gun. One eyewitness testified Gibbs pointed his gun at her and said, "B****, if you say anything, I'll shoot you too."

Wessels died at the scene from a single gunshot wound that penetrated his heart. After firing the fatal shot and threatening a witness, Gibbs fled. The gun that Gibbs used was never recovered.

Detective Larry Hedlund of the Fort Dodge Police Department led the investigation into Wessels's shooting. Because of the video evidence, the 911 call, and the statements from the eyewitnesses to the shooting, Gibbs became the immediate focus of the investigation. The day of the shooting, Hedlund went to Gibbs's girlfriend's house to interview her and look for Gibbs. Later the same day, the police executed search warrants at the girlfriend's house and at what the police believed to be Gibbs's main residence. The next day, September 4, Hedlund also interviewed Gibbs's sister, Roby, at her residence. And Hedlund went to Gibbs's mother's house. Hedlund informed each of these interviewees he was looking for

Gibbs, and Hedlund provided each of the interviewees his contact information. For nearly two days, Hedlund was unsuccessful in tracking down Gibbs.

At around 4:17 p.m. on September 4, Gibbs called Hedlund. Hedlund told Gibbs he wanted to take his statement, and the two arranged for a meeting. Approximately ten minutes later, Gibbs called back, indicating that he had changed his mind about meeting. The two continued to talk throughout the remainder of the day as Hedlund tried to coax Gibbs into meeting. Gibbs said he was going to "try to drag this thing out." Eventually, Hedlund gave up and went home to go to bed. Finally, Gibbs woke up Hedlund around 1:49 a.m. on September 5 and stated he would be willing to meet the detective at Gibbs's residence.

Shortly thereafter, Hedlund arrived at Gibbs's residence and conducted an interview. Gibbs's mother and grandmother were in the house and in the vicinity of the interview as it was going on. Hedlund later testified Gibbs was not under arrest. Hedlund testified Gibbs was coherent and appeared to understand Hedlund's questions. Hedlund interviewed Gibbs for two hours and sixteen minutes at Gibbs's dining room table. Hedlund repeatedly asked Gibbs if he had a gun at the time of the shooting, and Gibbs "adamantly and repeatedly denied he had a gun." Hedlund told Gibbs the shooting was on video. Gibbs nonetheless denied shooting Wessels. Hedlund asked Gibbs about the clothing he had been wearing at the time, and Gibbs gave inconsistent answers. None of the answers were consistent with the clothing that Gibbs was actually shown as wearing on the light pole video. Hedlund asked Gibbs to produce the clothing, and he declined to do so. After taking Gibbs's statement, Hedlund left the residence.

Hedlund returned to Gibbs's residence that afternoon and asked Gibbs to accompany him to the law enforcement center pursuant to a search warrant to provide a DNA sample, fingerprints, and photographs. Gibbs did so. At the center, in addition to collecting DNA, fingerprints, and photographs, Hedlund again interviewed Gibbs. Hedlund told Gibbs he was on camera shooting a gun. Gibbs said he "didn't believe a video existed of him shooting a gun or killing Shane Wessels." Gibbs was at the law enforcement center for a few hours in total. Once more, he denied having a gun or shooting Wessels.

After the interview, Hedlund drove Gibbs back to Gibbs's residence. When they arrived at Gibbs's residence, Gibbs volunteered to give Hedlund a damaged cell phone and told Hedlund it was the phone Gibbs had been carrying the night of the shooting. Subsequent forensic examination showed the phone had not been used since May.

On September 11, eight days after the shooting, the State charged Gibbs in the Webster County district court with murder in the first degree in violation of Iowa Code section 707.2 (2018). Gibbs was taken into custody on September 18 in Des Moines and transported to Fort Dodge. Upon arrival, he was read his *Miranda* rights and questioned. The questioning was recorded. Detective Hedlund showed Gibbs still pictures from the light pole video. Gibbs nonetheless continued to deny he shot Wessels. "I'm not the shooter at all," he said.

Despite his repeated pretrial denials that he had shot Wessels, Gibbs asserted a justification defense at trial. Specifically, Gibbs maintained he was acting in defense of his sister, Roby. The State put into evidence, without objection, testimony regarding Gibbs's flight from the scene, his failure to report his use of deadly force, his failure to produce his clothing from the night of the shooting, his failure to produce his gun

from the shooting, his repeated denials of shooting Wessels, and the recorded interviews with law enforcement. Meanwhile, several eyewitnesses confirmed what the light pole video showed: that Gibbs shot Wessels as he was standing shirtless, unarmed, and backing away from any confrontation.

Trial began on June 25, 2018. The defendant did not testify, but he did call two eyewitnesses on his behalf. One testified she saw Wessels hit Roby repeatedly and stomp on the face of another woman. She claimed she believed at the time that Roby was badly hurt. However, she also admitted she "d[id] not know how it initially started." And on cross-examination, this witness acknowledged she was "on [Roby's] team" and had posted on Facebook to that effect. She also testified she did not see the shooting. In fact, she did not "remember seeing" Gibbs and did not know if he had a gun.

Another defense witness testified he saw five or six people, including Gibbs and several women, jumping Wessels and Wessels fighting back. He saw Wessels hit Mosley after Mosley had tased Wessels. At that point, Wessels, Mosley, and Roby were all on the ground. Wessels then got up and tried to leave. At this point the witness saw Gibbs, who had returned with a gun, shoot Wessels.

The district court's proposed jury instructions included an instruction that paraphrased Iowa Code section 704.2B, part of the stand-your-ground legislation adopted by the legislature in 2017. *See* 2017 Iowa Acts ch. 69, § 40 (codified at Iowa Code § 704.2B (2018)).[1] Thus, the proposed instruction, Instruction No. 36, read as follows:

---

[1]Iowa Code section 704.2B states,

1. If a person uses deadly force, the person shall notify or cause another to notify a law enforcement agency about the person's use of deadly force within a reasonable time period after the person's use of the

A person using deadly force is required to notify or cause another to notify a law enforcement agency about his use of deadly force within a reasonable time period after the use of the deadly force, if the Defendant or another person is capable of providing such notification.

A person using deadly force is also required to not intentionally destroy, alter, conceal, or disguise physical evidence relating to the person's use of deadly force, and a person using deadly force cannot intentionally intimidate witnesses into refusing to cooperate with any investigation relating to the use of such deadly force or induce another person to alter testimony about the use of such deadly force.

Defense counsel objected to Instruction No. 36. Counsel contended the instruction violated the defendant's rights under the Iowa Constitution and the Fifth and Fourteenth Amendments. Defense counsel also argued if the district court were to give the instruction, the instruction should include language that the failure to notify law enforcement did not bar Gibbs's justification defense. The district court submitted Instruction No. 36 over counsel's objection and without modification.

After deliberations, the jury found the defendant guilty of the lesser included offense of murder in the second degree. *See* Iowa Code § 707.3(1). On July 27, Gibbs was sentenced to fifty years' imprisonment. *See id.* § 707.3(2).

Gibbs appeals. Through his appellate attorney, Gibbs argues that Iowa Code section 704.2B(1) on its face violates the privilege against self-incrimination; that the district court's Instruction No. 36 paraphrasing section 704.2B was improper; and that at a minimum, the district court

---

deadly force, if the person or another person is capable of providing such notification.

2. The person using deadly force shall not intentionally destroy, alter, conceal, or disguise physical evidence relating to the person's use of deadly force, and the person shall not intentionally intimidate witnesses into refusing to cooperate with any investigation relating to the use of such deadly force or induce another person to alter testimony about the use of such deadly force.

should have included his requested language that failure to notify law enforcement does not bar a justification defense. Gibbs also raises several arguments in a pro se brief. We retained the appeal.

### III. Standard of Review.

We review constitutional challenges to a statute de novo. *State v. Newton*, 929 N.W.2d 250, 254 (Iowa 2019). Challenges to jury instructions are reviewed for correction of errors at law. *State v. Bynum*, 937 N.W.2d 319, 324 (Iowa 2020).

### IV. Analysis.

**A. Does Iowa Code Section 704.2B(1) on Its Face Improperly Penalize Silence?** The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. The Fifth Amendment privilege against compulsory self-incrimination is applicable to the states via the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492 (1964). Although the Iowa Constitution does not have a parallel textual provision, this court has held the right to be free from compulsory self-incrimination is protected by the due process clause of the Iowa Constitution. *See* Iowa Const. art. I, § 9; *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 n.2 (Iowa 2011); *State v. Height*, 117 Iowa 650, 654–55, 91 N.W. 935, 938 (1902).

The United States Supreme Court has found that the Fifth Amendment can be violated even when the government does not directly coerce testimony from the defendant. It also forbids the use of a penalty that might compel the defendant into offering testimony against himself or herself. *Spevack v. Klein*, 385 U.S. 511, 514–15, 87 S. Ct. 625, 627–28 (1967). Thus, the Fifth Amendment generally protects "the right of a person to remain silent unless he chooses to speak in the unfettered

exercise of his own will, and to suffer no penalty . . . for such silence." *Id.* (quoting *Malloy*, 378 U.S. at 8, 84 S. Ct. at 1493–94).

Notably, in *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233 (1965), the Supreme Court held that the Fifth Amendment forbid comment by the prosecution on a defendant's failure to testify. As the Court explained, "It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." *Id.* at 614, 85 S. Ct. at 1232–33; *see also Carter v. Kentucky*, 450 U.S. 288, 300, 101 S. Ct. 1112, 1119 (1981) ("[T]he Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction [i.e., an instruction directing the jury not to draw an adverse inference from the defendant's failure to testify] when requested by a defendant to do so.").

In *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 2245 (1976), the Supreme Court held that it was a Fourteenth Amendment violation for the prosecution to impeach a testifying defendant at trial with his postarrest silence. "[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial," the Court stated. *Id.* at 618, 96 S. Ct. at 2245.

The Supreme Court has also addressed failure-to-report laws that criminalize silence in certain contexts. In *United States v. Sullivan*, 274 U.S. 259, 262, 47 S. Ct. 607, 607 (1927), the defendant was convicted of willfully refusing to make a tax return as required by the Internal Revenue Code. The defendant contended, and the circuit court held, the Fifth Amendment "protected the defendant from the requirement of a return" where the income was generated from illegal liquor sales. *Id.* at 263, 47 S. Ct. at 607. The Supreme Court rejected the argument, concluding that

"[i]t would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime." *Id.* at 263–64, 47 S. Ct. at 607.

*Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 71–72, 86 S. Ct. 194, 195–96 (1965), involved a challenge by members of the Communist Party of the United States of America to registration orders issued by the Subversive Activities Control Board. The members were subject to "very heavy penalties" for failing to register in compliance with the board's order. *Id.* at 75, 86 S. Ct. at 197 (noting "each day of failure to register constitutes a separate offense punishable by a fine of up to $10,000 or imprisonment of up to five years, or both"). In addition to being subject to penalties for the failure to register, the petitioners were also subject to criminal prosecution upon registration and admitting membership in the communist party. *See id.* at 77, 86 S. Ct. at 198 ("Such an admission of membership may be used to prosecute the registrant under the membership clause of the Smith Act, 18 U.S.C. § 2385 (1964 ed.) or under § 4(a) of the Subversive Activities Control Act, 64 Stat. 991, 50 U.S.C. § 783(a) (1964 ed.), to mention only two federal criminal statutes."). The Court set aside the registration orders on the ground the orders violated the Fifth Amendment. *See id.* at 81, 86 S. Ct. at 200. The Court further explained the registration orders ran afoul of the Fifth Amendment because "response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime." *Id.* at 79, 86 S. Ct. at 199.

In *California v. Byers*, 402 U.S. 424, 425, 91 S. Ct. 1535, 1536 (1971) (plurality opinion), the Supreme Court addressed the

narrow but important question of whether the constitutional privilege against compulsory self-incrimination [was] infringed by California's so-called "hit and run" statute which require[d] the driver of a motor vehicle involved in an accident to stop at the scene and give his name and address.

In *Byers*, the defendant was prosecuted for the failure to stop and identify himself after being involved in a motor vehicle accident. *See id.* at 426, 91 S. Ct. at 1537. Violation of the statute was punishable by imprisonment up to six months or a fine of $500 or both. *See id.* at 426 n.1, 91 S. Ct. at 1537 n.1. The Court upheld the reporting statute from constitutional challenge. *Id.* at 431, 91 S. Ct. at 1539. The court reasoned the disclosure of "automobile accidents simply do[es] not entail [a] . . . substantial risk of self-incrimination." *Id.* The Court further noted "the statutory purpose is noncriminal and self-reporting is indispensable to its fulfillment." *Id.* The Court further explained there is no constitutional right to flee the scene even if remaining and reporting might lead to criminal prosecution:

> Although identity, when made known, may lead to inquiry that in turn leads to arrest and charge, those developments depend on different factors and independent evidence. Here the compelled disclosure of identity could have led to a charge that might not have been made had the driver fled the scene; but this is true only in the same sense that a taxpayer can be charged on the basis of the contents of a tax return or failure to file an income tax form. There is no constitutional right to refuse to file an income tax return or to flee the scene of an accident in order to avoid the possibility of legal involvement.

*Id.* at 434, 91 S. Ct. at 1541.

And in *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 181–82, 187, 190–91, 125 S. Ct. 2451, 2456, 2459, 2461 (2004), the Supreme Court found no Fifth Amendment violation when an individual was convicted of disobeying a law that required a detained person to "identify himself," but also provided he "may not be compelled to answer any other inquiry of any peace officer." The Court noted,

12

> The narrow scope of the disclosure requirement is also important. One's identity is, by definition, unique; yet it is, in another sense, a universal characteristic. Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances. In every criminal case, it is known and must be known who has been arrested and who is being tried.

*Id.* at 191, 124 S. Ct. at 2461 (citations omitted).

Gibbs argues that Iowa Code section 704.2B(1) on its face violates the Fifth Amendment. From the Supreme Court precedents, Gibbs distills and proposes a four-factor test to determine whether a reporting or disclosure statute creates unconstitutional risk of compelled self-incrimination: (1) whether the statute is regulatory or criminal; (2) whether the statute is directed at the public at large or a highly selective group inherently suspected of criminal activities; (3) whether the statute creates a real and appreciable risk of self-incrimination; and (4) whether the statute compels the disclosure of information which would constitute a significant link in the chain of evidence tending to establish guilt. *See Byers*, 402 U.S. at 430–31, 92 S. Ct. at 1539 (noting that the "stop and identify" statute found not to violate the Fifth Amendment "is essentially regulatory, not criminal," that it is "directed at the public at large," and that the required disclosures "simply do not entail the kind of substantial risk of self-incrimination involved in [prior cases where a Fifth Amendment violation was found]" (second quote *Albertson*, 382 U.S. at 79, 86 S. Ct. at 199)); *Albertson*, 382 U.S. at 79, 86 S. Ct. at 199 ("Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime."). Under the four-factor test, Gibbs argues, Iowa Code section 704.2B is constitutionally infirm.

Gibbs urges us to follow the Idaho Supreme Court's lead in *State v. Akins*, 423 P.3d 1026 (Idaho 2018). In *Akins*, an Idaho statute made it a crime for a person who finds or has custody of a body to fail to promptly notify authorities. *Id.* at 1027. The court found that the statute as applied to the defendant violated her Fifth Amendment privilege. *Id.* at 1034–35. The record showed the defendant moved and attempted to dispose of a body in a lake after the decedent had died of a drug overdose. *See id.* at 1028. The reporting statute at issue was a criminal statute, and violation of the statute was punishable by a term of incarceration not to exceed ten years or a fine not to exceed $50,000 or both. *See id.* at 1029. The Idaho Supreme Court held the prosecution for the failure to report the death, as applied, violated the defendant's right against self-incrimination. *See id.* at 1034. The court also observed that "on its face, the statute fits somewhere between *Albertson* and *Byers*: it applies against the public at large but carries with it an underlying criminal purpose." *Id.*

The State responds that cases like *Akins* and *Albertson* are inapplicable because Iowa Code section 704.2B(1) "does not punish a defendant's failure to comply with criminal sanctions." We agree that a failure to comply with section 704.2B(1) carries no criminal sanctions. Therefore, we pass over the question of whether that section violates the Fifth Amendment merely by being on the books. We turn to the more salient issue of how section 704.2B was used by the district court in this case.

**B. Does Giving a Jury Instruction Based on Iowa Code Section 704.2B Improperly Penalize Silence?** We quote again the first paragraph of Instruction No. 36:

> A person using deadly force is required to notify or cause another to notify a law enforcement agency about his use of deadly force within a reasonable time period after the

use of the deadly force, if the Defendant or another person is capable of providing such notification.

The district court's implementation of section 704.2B through a jury instruction puts someone who has used deadly force in a dilemma.[2] Either the person gives up his or her right to remain silent, or in a later prosecution, the person faces a jury told that he or she violated the law in not doing so. The question, as before, is whether this imposes an improper penalty on the exercise of the constitutional right to remain silent.[3]

We think it does. A jury instruction authorizing an inference of guilt in a murder case because the defendant breached a legal duty to make a report to authorities exacts a significant penalty on the defendant's right to remain silent. The State directs us to three categories of cases; we think all are readily distinguishable.

First, there are cases allowing the State to argue adverse inferences from the defendant's conduct. A recent example is *State v. Wilson*, 878 N.W.2d 203, 211–14 (Iowa 2016). In *Wilson*, we found that the State could introduce evidence of the defendant's flight from law enforcement and argue that it showed consciousness of guilt, although we held that such

_____

[2]The parties' arguments and briefing have focused on the first half of Iowa Code section 704.2B, the notification requirement, *see* Iowa Code § 704.2B(1), and the corresponding first paragraph of Instruction No. 36. We do not address the constitutional ramifications of a jury instruction based only on section 704.2B(2).

[3]A question could be raised whether Gibbs's appellate counsel are raising an as-applied Fifth Amendment challenge to the use of Iowa Code section 704.2B in a jury instruction. We believe they are. There is no doubt, as already noted, that trial counsel made a Fifth Amendment objection to the instruction below. On appeal, Gibbs likewise maintained that the use of section 704.2B in a jury instruction violated the Fifth Amendment. Appellate counsel quoted from trial counsel's objection to the instruction to demonstrate that error preserved. Then, on the merits, as part of the Fifth Amendment argument, appellate counsel urged, "When paired with the other instructions, [the] Iowa [C]ode [section] 702.4B instruction suggests that failure to inform law enforcement equals criminal culpability." Appellate counsel went on to quote disapprovingly from the State's rebuttal argument, in which the State asked the jury to rely upon the instruction and Gibbs's failure to report as a basis for inferring his guilt. In short, Gibbs's overall Fifth Amendment argument on appeal included an attack on the instructional use of section 704.2B.

evidence is subject to an Iowa Rule of Evidence 5.404(*b*) screen and must be treated "with caution." *Id.*

*Wilson* relied on an Iowa case indicating that the State can use the defendant's failure to report coupled with other conduct to argue the defendant's conduct was not justified. *Id.* at 211 (citing *State v. Shanahan*, 712 N.W.2d 121, 138 (Iowa 2006)). We said in *Shanahan*,

> When a person is required to use deadly force to protect himself or herself, normally the first course of action is for that person to notify the authorities and report the incident. We believe Dixie's failure to contact the authorities after the incident coupled with her elaborate plan to create the illusion Scott was still alive, of which these acts are a part, is inconsistent with a person's claim of self-defense.

712 N.W.2d at 138.

Those cases are different. It is one thing for parties in litigation to make various arguments from the evidence based on common sense and experience. It is quite another for the court in an official instruction to tell the jury that the defendant whose innocence or guilt they are determining has already, in effect, violated the law by not making a report. The latter puts a heavy thumb on the State's side of the scale. An instruction coming from the judge, and received by the jurors as law they must follow, is very different from a litigant's argument, which the jury can weigh as they wish and choose to ignore.

Second, and relatedly, there are cases allowing the State to argue adverse inferences from a defendant's prearrest silence when the defendant did not invoke his or her Fifth Amendment rights in response to questioning. *See Salinas v. Texas*, 570 U.S. 178, 186, 133 S. Ct. 2174, 2180 (2013) (plurality opinion). *Salinas* has not won universal acceptance in the state courts. *See, e.g., State v. Tsujimura*, 400 P.3d 500, 520 (Haw. 2017) (deciding not to follow *Salinas* under the Hawai'i Constitution and

concluding that "the State may not elicit evidence of prearrest silence to imply the defendant's guilt").

Regardless, *Salinas* is different from a court instruction that penalizes the defendant in the guilt or innocence stage for failing to affirmatively seek out the authorities and speak to them prearrest—with no Fifth Amendment exception.[4] Having the benefit of a judge's instruction reciting a legal obligation empowers the prosecution and stifles the defendant in a way that simply being able to argue facts to the jury doesn't. Consider the following excerpt from the State's rebuttal closing argument:

> I want you also to consider Instruction No. 36. The Court tells you what the law is when somebody uses deadly force. The Court says, "A person using deadly force is required to notify or cause another to notify a law enforcement agency about his" -- or it could be her -- "use of deadly force within a reasonable degree" -- excuse me, "within a reasonable time period," if they can do so.

> Ladies and gentlemen, remember I asked the witnesses in this case, "Did the Defendant ever call 911?" And the answer was no. I also asked "At any point, did he contact law enforcement and say that he had shot Mr. Wessels?" Ladies and gentlemen, he did not. He did not fulfill one of the duties if somebody uses deadly force.

---

[4]*Salinas* is a case about the timing of invocation of Fifth Amendment Rights. It indicates that the defendant who wishes to avoid a prosecutor's trial argument about his silence during a voluntary, noncustodial police interview has to invoke the Fifth Amendment at the time he is questioned, not at the time of trial. *Salinas*, 570 U.S. at 183–86, 133 S. Ct. at 2179–80.

But this is not a case about the timing of invocation. The statute imposes an affirmative duty on the defendant without even being questioned to self-report the homicide he just committed. It would be absurd to suggest Gibbs could, as a practical matter, invoke the Fifth Amendment at that time. Assuming he was even aware of the statute, would he call the Fort Dodge Police and say, "Hi, I'm Levi Gibbs, and I'm taking the Fifth"? Even referencing the statute would potentially incriminate him because it would inform the police that he had just used deadly force and they ought to investigate him. The only practical time to raise the Fifth Amendment was when the defendant did raise it, namely, at the jury instruction conference. The issue here is *whether the instruction itself* violated the defendant's Fifth Amendment rights.

Finally, there are regulatory statutes that impose adverse consequences on not speaking when there is a legitimate regulatory reason to require the speech—e.g., parental termination laws that penalize a parent's refusal to explain what happened to the child; sex offender laws that penalize an already convicted defendant for not participating in sex offender treatment where the defendant would have to admit his or her prior misconduct; and the laws involved in *Sullivan, Byers*, and *Hiibel. See Hiibel*, 542 U.S. at 191, 124 S. Ct. at 2461; *McKune v. Lile*, 536 U.S. 24, 48–49, 122 S. Ct. 2017, 2032–33 (2002) (O'Connor, J., concurring); *Byers*, 402 U.S. at 427, 91 S. Ct. at 1537; *Sullivan*, 274 U.S. at 263–64, 47 S. Ct. at 607; *Iowa Dist. Ct.*, 801 N.W.2d at 515; *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002). Any analogy to those statutes, however, runs out of steam because a jury instruction restating 704.2B doesn't serve a significant regulatory purpose other than facilitating the defendant's conviction of the homicide offense.

Arguably, if failure to report a use of deadly force were an independent crime, this would incentivize a knowledgeable person who uses deadly force (or a person who consults counsel after using deadly force) to come forward to the authorities. This would help assure that the decedent is found quickly and relatives are notified promptly. These regulatory purposes could be separated from crime-solving itself. One still might argue that criminal-justice purposes substantially outweigh any regulatory purposes,[5] but at least there would be a bona fide regulatory purpose.

But what is the valid regulatory purpose served by instructing the jury on the words of section 704.2B? In that case, the statute applies only

---

[5]Again, we are not deciding whether Iowa Code section 704.2B on its face violates the Fifth Amendment.

to a narrow group of individuals who are being charged with homicide. And what is the point of giving the instruction? The State never says, but there can only be one answer—so the jury holds it against the defendant in some significant but indeterminate way. This penalizes the defendant, and it does so without serving a valid regulatory end.

The State argues that the justification defense in Iowa is statutory and that the general assembly can condition the availability of that defense in whatever way it chooses. The State refers us to *Cruz v. State*, 189 So. 3d 822, 829 (Fla. Dist. Ct. App. 2015), where a Florida appellate court held that it did not violate the Fifth Amendment for a defendant's pretrial stand-your-ground hearing testimony to be used against him at trial. But there is a critical difference between Florida and Iowa. In Florida, stand-your-ground is an additional immunity created by the legislature that may be raised by the defendant in a separate pretrial hearing. *See* Fla. Stat. Ann. § 776.032(1) (West, Westlaw current through 2019 1st Reg. Sess.). Even if the defendant skips or loses the stand-your-ground hearing, he or she is not precluded from submitting justification to the jury as an affirmative defense at trial. *See Peterson v. State*, 983 So. 2d 27, 29 (Fla. Dist. Ct. App. 2008). In short, a defendant who wants to jealously guard his or her privilege against self-incrimination can pass up the pretrial hearing and go directly to trial.

But here the legislature did not limit the applicability of Iowa Code section 704.2B to the expanded justification defense that it enacted in 2017. The reporting requirement—as carried forward in Instruction No. 36—applies to *any* assertion of the justification defense in a homicide case. Justification is a historical common law defense, *see, e.g., State v. Kennedy*, 20 Iowa 569, 571–72 (1866), and the effect of the district court's instruction is to burden the traditional assertion of that defense in the

traditional way simply because the defendant exercised his or her constitutional right not to self-report his or her conduct to the authorities.

For all these reasons, we find that Gibbs's Fifth Amendment rights as incorporated through the Fourteenth Amendment were violated when, over his objection, the district court gave a jury instruction paraphrasing Iowa Code section 704.2B(1).[6]

**C. Was Any Error Harmless Beyond a Reasonable Doubt?** The State argues that even if there was error in giving this instruction, it was harmless beyond a reasonable doubt. "In order for a constitutional error to be harmless, the court must be able to declare it harmless beyond a reasonable doubt." *State v. Simmons*, 714 N.W.2d 264, 275 (Iowa 2006) (quoting *State v. Deases*, 518 N.W.2d 784, 791 (Iowa 1994)).

After careful review of the record, we find the error harmless beyond a reasonable doubt. The evidence of guilt was overwhelming. This was the rare murder case where the murder was captured on video. The video shows Gibbs entering the scene and shooting at Wessels as Wessels is backing up, withdrawing, and disengaging. Other eyewitnesses corroborated the video. Even when Gibbs was confronted with the video's existence, Gibbs repeatedly lied, denying he was the shooter. Gibbs also dissembled about his clothing and tried to lead the police astray by giving them a cell phone he had not been using for months.

Gibbs called two witnesses at trial, but one was shown to be heavily biased and in any event said she didn't remember seeing Gibbs or the shooting. The other witness essentially supported the State's version of events.

---

[6]Because we resolve this issue under the Federal Constitution, we do not reach the issue of whether there was a violation of article I, section 9 of the Iowa Constitution. We also do not reach the issue of whether article I, section 9 has been properly raised. That issue has not been briefed or argued by any party.

In sum, even though instructing the jury that a homicide defendant is required to notify a law enforcement agency of his or her use of deadly force violates the defendant's Fifth Amendment rights, here any error was harmless beyond a reasonable doubt because the evidence of guilt was so strong and that of justification was so weak.[7]

One might argue that there is a tension between our harmless error conclusion and our conclusion that a jury instruction on Iowa Code section 704.2B violates the defendant's Fifth Amendment rights. There isn't. The instruction unconstitutionally penalizes the defendant's silence and is therefore improper to use in *all* cases, but in *this* case the error was harmless. Similarly, a *Griffin* violation unconstitutionally penalizes a defendant's silence, but is nonetheless subject to a harmless error analysis. *See United States v. Hasting*, 461 U.S. 499, 509, 103 S. Ct. 1974, 1980 (1983).[8]

---

[7]In his pro se brief, Gibbs asserts that he was denied the right to a fair and impartial trial, denied due process and equal protection of the laws, and denied the right to present his defense due to (1) the failure of the jury to represent a fair cross section of the community and (2) juror bias on the part of four jurors.

As to Gibbs's first claim, he made no objection at the time of trial, so error is not preserved. In any event, Gibbs merely asserts that the jury "eventually chosen" did not reflect the racial composition of his community. The fair-cross-section requirement, however, applies to the venire, not the final twelve members who are seated. *See State v. Moore*, 469 N.W.2d 269, 272 (Iowa Ct. App. 1991).

As to Gibbs's claim regarding juror bias, one of the four jurors was stricken, and her statements occurred when she was questioned individually outside the presence of other jurors. Gibbs did not preserve error as to the other three jurors either because his counsel did not request the juror be stricken for cause or because counsel did not comply with the procedure set forth in *State v. Jonas*, 904 N.W.2d 566, 583–84 (Iowa 2017). In any event, Gibbs's pro se brief takes the jurors' comments out of context and disregards other statements by these three jurors indicating that they could be fair and impartial.

[8]In his pro se brief, Gibbs asserts that he was denied the right to a fair and impartial trial, denied due process and equal protection of the laws, and denied the right to present his defense due to (1) the failure of the jury to represent a fair cross section of the community and (2) juror bias on the part of four jurors.

As to Gibbs's first claim, he made no objection at the time of trial, so error is not preserved. In any event, Gibbs merely asserts that the jury "eventually chosen" did not reflect the racial composition of his community. The fair-cross-section requirement,

### V. Conclusion.

For the foregoing reasons, we affirm Gibbs's conviction and sentence.

**AFFIRMED.**

Christensen, C.J., and Appel, Waterman, and Oxley, JJ., join this opinion. McDonald, J., files a concurring opinion in which Oxley, J., joins as to division I.

---

however, applies to the venire, not the final twelve members who are seated. *See State v. Moore*, 469 N.W.2d 269, 272 (Iowa Ct. App. 1991).

As to Gibbs's claim regarding juror bias, one of the four jurors was stricken, and her statements occurred when she was questioned individually outside the presence of other jurors. Gibbs did not preserve error as to the other three jurors either because his counsel did not request the juror be stricken for cause or because counsel did not comply with the procedure set forth in *State v. Jonas*, 904 N.W.2d 566, 583–84 (Iowa 2017). In any event, Gibbs's pro se brief takes the jurors' comments out of context and disregards other statements by these three jurors indicating that they could be fair and impartial.

**McDONALD, Justice (concurring specially in the judgment).**

The Iowa Code requires a person who uses deadly force to, among other things, "notify or cause another to notify a law enforcement agency about the person's use of deadly force within a reasonable time period after the person's use of the deadly force." Iowa Code § 704.2B(1) (2018). The district court instructed the jury on the applicable law, and the parties argued to the jury the inferences, if any, to be drawn from the defendant's failure to comply with the applicable law. The majority concludes the district court's instruction on the applicable law violated the defendant's privilege against self-incrimination. With this, I respectfully disagree. Because I conclude the defendant has failed to establish a violation of his constitutional rights, however, I would affirm the defendant's conviction. I thus respectfully concur in the judgment.

I.

I first address the defendant's claim arising under the Iowa Constitution. The defendant contends the district court's instruction violated his right to due process and right to a fair trial under article I, section 9 of the Iowa Constitution. In my view, the defendant waived his state constitutional claim. The defendant failed to develop an argument or cite authority in support of his claim. In the past, this court has excused a party's failure to cite authority in support of a state constitutional claim. Going forward, this court should hold a party raising a state constitutional claim must brief the claim in a separate brief point with citations to relevant Iowa authority and the failure to do so constitutes waiver of the claim. *See* Iowa R. App. P. 6.903(2)(*g*)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

A.

It is a well-established principle that a party's failure to sufficiently identify and brief an issue constitutes waiver of the issue. The failure to clearly identify an issue constitutes waiver. *See Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018) (discussing the specificity requirement). The failure to make an argument in support of an issue constitutes waiver. *See State v. Vaughan*, 859 N.W.2d 492, 503 (Iowa 2015) (finding waiver where party presented "no argument in support of his contention"); *State v. Short*, 851 N.W.2d 474, 479 (Iowa 2014) (declining to address the merits of arguments not made, "as under our rules and our precedents they have been waived in this appeal"); *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005) ("In the absence of an argument on these allegations [on appeal], we deem them waived."), *superseded by statute on other grounds*, 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)). The failure to make more than a perfunctory argument constitutes waiver. *See State v. Tyler*, 867 N.W.2d 136, 166 n.14 (Iowa 2015) (indicating a "passing reference" in a brief is insufficient). The failure to cite any authority in support of an issue constitutes waiver. *See* Iowa R. App. P. 6.903(2)(*g*)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *James v. State*, 858 N.W.2d 32, 34 (Iowa Ct. App. 2014) ("James also cites no authority supporting the 'deprivation of services' argument. Accordingly, he has waived error on the argument, even if it is properly before us.").

In this case, Gibbs waived his argument arising under the Iowa Constitution. The entirety of the defendant's argument in support of his state constitutional claim is two sentences. At the beginning of his brief, Gibbs notes that "Iowa courts are free to interpret the state constitution more stringently than its federal counterpart, 'providing greater protection

for our citizen's constitutional rights.'" Def. Br. 21 (quoting *Nguyen v. State*, 878 N.W.2d 744, 755 (Iowa 2016)). At the end of his brief, Gibbs states, "Further, due to the violation of [his] Fifth Amendment rights, Gibbs was denied his right to a fair trial under article I, § 9 of the Iowa Constitution." While Gibbs identified a state constitutional claim, he did not make more than a perfunctory argument in support of the state constitutional claim, and he did not cite any authority in support of his state constitutional claim. Gibbs's perfunctory argument without citation to any authority constitutes waiver of his state constitutional claim. *See* Iowa R. App. P. 6.903(2)(*g*)(3); *Tyler*, 867 N.W.2d at 166 n.14; *Vaughan*, 859 N.W.2d at 503; *Short*, 851 N.W.2d at 479; *Seering*, 701 N.W.2d at 661; *State v. Juste*, 939 N.W.2d 664, 677 (Iowa Ct. App. 2019) (holding the defendant waived an argument after citing only a single inapposite case in support of the argument); *James*, 858 N.W.2d at 34.

## B.

Gibbs's failure to brief his state constitutional claim is not atypical, but we have excused this failure as a matter of prudence. As we noted in *Short*, "Notwithstanding the development of independent state constitutional law, in many cases lawyers do not advocate an Iowa constitutional standard different from the generally accepted federal standard." 851 N.W.2d at 491. In the past, "[a]s a matter of prudence, we have adopted the approach in these cases that we will utilize the general standard urged by the parties, but reserve the right to apply the standard in a fashion different than the federal caselaw." *Id.*; *see State v. Kuhse*, 937 N.W.2d 622, 631 n.3 (Iowa 2020) (Appel, J., concurring specially) (stating the defendant did not cite either the Federal or Iowa Constitution, which allowed the court to apply the federal standard for the purposes of Iowa law while "reserving the right to apply the federal standard more

stringently than the federal courts"); *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 566 (Iowa 2019) ("The plaintiffs have not suggested that we should follow different substantive standards under the Iowa Constitution than would be applied to procedural due process claims under the Federal Constitution.  As a result, we apply the substantive federal standards, reserving the right to apply these standards in a more stringent fashion than under federal caselaw."); *State v. Graham*, 897 N.W.2d 476, 481 (Iowa 2017) ("[W]e do not necessarily apply the federal standards in a fashion identical to the United States Supreme Court."); *State v. Lindsey*, 881 N.W.2d 411, 427 (Iowa 2016) (noting that while "we apply the federal framework for the purpose of this case," we also "reserve the right to apply that framework in a fashion different from federal caselaw"); *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011) ("Even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal case law.").

This court should no longer excuse a party's inadequate briefing on a state constitutional claim by defaulting to the federal standard but reserving the right to apply the federal standard in a different fashion.  At least three reasons dictate this conclusion.  First, our decision to excuse inadequate briefing by applying the federal standard but reserving the right to reach a different result is not consistent with the adversarial process.  We have an adversarial legal system.  In our system, courts do not direct parties on what issues to raise.  In our system, courts afford parties the freedom to choose what issues to raise.  This freedom, however, imposes corresponding duties on parties.  With respect to appellate practice, one of those duties is the duty to sufficiently brief an issue to allow for meaningful appellate review.  This means when a party advances

a claim involving questions of state constitutional law, it is incumbent upon the party to actually research state constitutional law, actually make an argument regarding state constitutional law, and actually cite authority relevant to state constitutional law. Our cases that excuse this requirement are inconsistent with the adversarial process. *See Goode*, 920 N.W.2d at 524 (stating judicial restraint requires the parties to raise and brief the issues); *In re S.P.*, 719 N.W.2d 535, 539–40 (Iowa 2006) (stating "the court is prohibited from assuming the role of an advocate" and calling for "what Edmund Burke described as the 'cold neutrality of an impartial judge' " (quoting *State v. Glanton*, 231 N.W.2d 31, 35 (Iowa 1975))).

Second, this court's decision to excuse inadequate briefing by substituting Iowa constitutional law with federal constitutional law is inconsistent with this court's duty to determine the meaning of the state constitution. This court is the final arbiter of the meaning of the Iowa Constitution, not the Supreme Court of the United States:

> We are asked by appellants' counsel to change the later ruling of this court and abandon the principles of the adjudications so frequently heretofore announced . . . . This we are asked to do, not because these rulings and the principles of construction of our Constitution upon which they are based are unsound, but because the Supreme Court of the United States, which is termed, in the language of appellants' counsel, the final arbiter upon these questions, has disregarded the decisions of this court, and in cases before it, has overruled them.

> The questions determined, and upon which there has thus arisen a conflict between this court and the federal courts, are purely those arising upon the construction of the laws and Constitution of our own State. The language of counsel is, therefore, incorrect.

> *The Supreme Court of the United States is not in cases of this kind the final arbiter. That august tribunal, the court of last resort in all cases within the federal jurisdiction, as prescribed by the Constitution and laws of the Union, is not charged with the grave duty and great power of construing the Constitution and laws of the States, except where they may be in conflict*

*with the federal laws and Constitution, and of establishing thereby a rule of construction obligatory upon the State courts. In questions of this kind it is, in no sense, the final arbiter, but by a course of adjudications beginning at the foundation of the government and extending to the present time, it is required to look to the courts of the States for the rules of construction of their respective laws and Constitutions. Upon such questions, then, it is, in law and in fact, inferior in authority to the courts of the States.* It has the power to disregard the decision of the State courts upon such questions and to enforce its own decisions in a class of cases over which it has jurisdiction; but the superior authority of its decisions upon these questions has not been and never can be admitted. We can not, therefore, be expected to conform our rulings to the opinion of that court upon questions of this character when they are in conflict with the adjudications of this court.

*McClure v. Owen,* 26 Iowa 243, 248–50 (1868) (emphasis added). Just last term, in *Brown,* we "acknowledge[d] our duty to interpret [the Iowa Constitution] independently." *State v. Brown,* 930 N.W.2d 840, 847 (Iowa 2019).

The duty of independent interpretation requires more than adopting the federal standard but choosing to apply it differently. The duty of independent interpretation requires an investigation into the meaning of our constitution. As I noted in *Brown,*

> [T]his court has a duty to independently interpret the Iowa Constitution. This court discharges that duty by looking to the text of the document through the prism of our precedent, tradition, and custom. This court's interpretation of the Iowa Constitution may be the same as the Supreme Court's interpretation of a parallel provision of the Federal Constitution. This court's interpretation of the Iowa Constitution may be different than the Supreme Court's interpretation of a parallel provision of the Federal Constitution. But this court's interpretation of the Iowa Constitution is not dictated by the Supreme Court's precedents under the incorporation doctrine of the Federal Constitution.

*Id.* at 861 (McDonald, J., concurring specially). Justices Appel and Wiggins agreed the duty of independent interpretation means more than "importing whole hog" the federal framework:

> Frankly, I have very little interest in importing whole hog to Iowa the approach adopted by the Supreme Court in Washington, D.C. Not only should we not incorporate the federal cases, there should be no presumption, or special weight, given to the Supreme Court's precedents. We should think for ourselves.
>
> That said, I agree with Justice McDonald that there should be no artificial presumption that the Iowa Constitution is more protective than federal caselaw in any given case. Instead, we should independently examine each case, free from any predisposition, and engage in a thorough review of plausible legal options without any artificial doctrines that block independent thinking. In light of Justice McDonald's opinion, it is clear that a majority of this court continues to embrace this approach.

*Id.* at 887 (Appel, J., dissenting). I agree with Justice Appel's conclusion that we should think for ourselves on questions of state constitutional law, and I would go further—we have a duty to think for ourselves on questions of state constitutional law. Applying the federal standard but reserving the right to reach a different result does not discharge our duty of independent interpretation.

Third, and related, this court's decision to excuse inadequate briefing by applying the federal standard but reserving the right to apply the federal standard in a different fashion rests on the presumptions (1) that federal law and state law with respect to parallel provisions of the constitution are largely the same due to the incorporation doctrine and (2) that federal law sets the floor but not the ceiling with respect to the right at issue. The presumptions are wrong. *See id.* at 858 (McDonald, J., concurring specially) ("Brown's contention that the incorporation doctrine dictates the minimum required content of state constitutional law misapprehends the incorporation doctrine. Incorporation did not change the substantive content of state constitutional law; it changed the substantive content of federal constitutional law."). "The Supreme Court's

Fourteenth Amendment jurisprudence does not dictate the substance of the state law or the remedy for any violation of the same." *Id.*

For these reasons, I would hold a party raising a state constitutional claim must brief the claim in a separate brief point with citations to relevant Iowa authority and the failure to do so constitutes waiver of the claim. *See* Iowa R. App. P. 6.903(2)(*g*)(3); *State v. LaMar*, 260 Iowa 957, 970, 151 N.W.2d 496, 503 (1967) ("We have adequate procedure, if followed, to properly determine the constitutional question involved and there is a legitimate interest and a sound public purpose to be served by a procedural rule which requires that . . . this court be apprised of the question of law involved in the manner prescribed by the statute and our decisions.").

C.

This concern is not merely a procedural or academic concern. Consider the significant textual difference between the Federal and Iowa Constitutions regarding the privilege against self-incrimination and how that textual difference resulted in wholly different federal and state doctrines. As the discussion below will show, because of the potentially significant differences between federal constitutional law and state constitutional law, a party's perfunctory statement that this court can use the federal standard but apply it more stringently to determine the substantive content Iowa constitutional law is not legally sound.

The most obvious difference between the Federal and Iowa Constitutions regarding the privilege against self-incrimination is textual. The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. The Iowa Constitution does not have a corresponding or parallel provision regarding this right. Over the course

of time, the textual distinction between the two constitutions resulted in significantly different federal and state doctrine.

Some background is necessary to understand the divergence in doctrine. At the time of Iowa's founding, by statute, a criminal defendant was not competent to testify at trial. *See State v. Ferguson*, 226 Iowa 361, 364–67, 283 N.W. 917, 918–19 (1939) (discussing versions of the Iowa Code from 1851 through 1873 that prohibited a defendant from testifying), *overruled by State v. Johnson*, 257 Iowa 1052, 1056, 135 N.W.2d 518, 521 (1965). Because the defendant was statutorily barred from testifying at trial, it was "obvious[]" that the prosecution could not comment upon the defendant's trial silence. *See id.* at 364, 283 N.W. at 919 ("With the defendant in a criminal case declared to be incompetent to testify in his own behalf, obviously his failure to testify would not be a matter upon which the county attorney could comment.").

The statutory bar prohibiting criminal defendants from testifying at trial was eventually lifted. The Code of 1897 provided a defendant could testify at trial but the prosecutor was prohibited from commenting on a defendant's trial silence if a defendant elected not to testify:

> Defendants in all criminal proceedings shall be competent witnesses in their own behalf, but cannot be called as witnesses by the state; and should a defendant not elect to become a witness, that fact shall not have any weight against him on the trial, nor shall the attorney or attorneys for the state during the trial refer to the fact that the defendant did not testify in his own behalf; and should they do so, such attorney or attorneys will be guilty of a misdemeanor, and defendant shall for that cause alone be entitled to a new trial.

Iowa Code § 5484 (1897).

Shortly after the passage of this provision, this court wrestled with a self-incrimination question. In *State v. Height*, the defendant was charged with "having sexual intercourse with a female under the age of

consent." 117 Iowa 650, 652, 91 N.W. 935, 935 (1902). To prove the defendant committed the offense, the state sought evidence that the defendant had a venereal disease and transmitted the same to the child. *See id.* To obtain evidence of the disease, the police arrested the defendant. *See id.* at 653–54, 91 N.W. at 935–36. In the presence of the county attorney and the arresting officer, the state forced the defendant to undergo a medical examination of his "privates." *Id.* at 653–54, 91 N.W. at 935–36. The results of the medical examination were admitted at trial over the defendant's objection. *See id.* at 652, 91 N.W. at 935. While recognizing the Iowa Constitution contained no "specific provision" regarding self-incrimination, the court concluded the privilege against compulsory self-incrimination was included within the concept of due process under article I, section 9 of the Iowa Constitution. *Id.* at 659–61, 91 N.W. at 938 ("[S]uch an investigation as that made in the case before us is without authority as against defendant's objection, and the receipt of the evidence was error, on the ground that it was the result of the invasion of defendant's constitutional right, impliedly guaranteed under the provision of our constitution as to due process of law, not to criminate himself."). The court held the forced medical examination violated the defendant's right to due process, the evidence should have been excluded, and the defendant was entitled to a new trial. *See id.* at 665, 667, 91 N.W. at 940. *Height* did not address what use, if any, the prosecutor could make of the defendant's refusal to voluntarily submit to the medical examination.

In 1929, the legislature repealed the provision disallowing the prosecutor from commenting on the defendant's failure to testify at trial. *See Ferguson*, 226 Iowa at 365–66, 283 N.W. at 919 (discussing legislative history). In *Ferguson*, this court examined the constitutional implications

of the statutory repeal. The defendant was convicted of stealing eleven head of cattle. *Id.* at 362, 283 N.W. at 918. In his opening argument, the prosecutor, over the defendant's objection, commented on the fact the defendant was not going to testify at trial. *Id.* at 363, 283 N.W.2d at 918. On appeal, the defendant contended the State's use of the defendant's trial silence as substantive evidence of guilt violated the defendant's right to due process under article I, section 9 of the Iowa Constitution. *Id.* at 363–64, 283 N.W. at 918. After surveying the relevant authorities, the court rejected the defendant's due process argument:

> Due process of law requires that the accused be properly charged by an indictment or information and be given adequate information in regard to the nature of the charge against him, that he be accorded representation by counsel, a jury trial in open court, and that the state introduce such competent evidence which, if believed, would be sufficient to establish a defendant's guilt beyond a reasonable doubt, without compelling the defendant, against his will, to testify against himself. When this has been accomplished, the defendant must be accorded full opportunity to introduce his evidence to meet that introduced by the state. Defendant may choose to introduce no evidence. He may choose to offer only witnesses other than himself. He may choose to testify in his own behalf. The choice, in each event, is that of the defendant. Having made his choice, if he chooses not to testify in his own behalf, the effect of such choice, as an inference or presumption of guilt, does not come within the contemplation of what constitutes due process of law. If the effect of such choice is to be determined by constitutional provision, it must be determined by some provision other than the due process clause. If the constitution contains only the due process clause, as does our constitution, then the effect to be given the failure to testify is a matter for the legislature to determine. Were we to sustain appellant's contention herein, the result would be that, under the guise of construing the due process clause, we would, in effect, re-enact Section 13891 of the Code of 1927, which the 43rd Gen. Assem., c. 269, in 1929, chose to repeal. This we cannot do.

*Id.* at 372–73, 283 N.W. at 922–23; *see State v. Graff*, 228 Iowa 159, 173, 290 N.W. 97, 103 (1940) ("While such failure to testify did not deprive the defendant of the presumption of innocence, the jury was entitled to

consider it as an inference of guilt, and the county attorney was entitled to comment upon it.").

Just over two years later, this court extended the rationale of *Ferguson* to allow the prosecutor to use the defendant's pretrial refusal to provide information as substantive evidence of guilt. In *State v. Benson*, 230 Iowa 1168, 1171–72, 300 N.W. 275, 277 (1941), this court recognized the due process clause of the Iowa Constitution prohibited a defendant from being compelled to provide information, as recognized in *Height*, but concluded it did not prohibit the state from using the defendant's pretrial refusal to take a blood test as substantive evidence of guilt. The court reasoned,

> Defendant did not take the stand in his own defense. He could not be compelled to testify. However, the fact that he did not testify was a circumstance to be considered by the jury and was a proper subject for comment by the county attorney. His refusal to testify is analogous to his refusal to submit to a blood test. Were we to concede that, pursuant to our decisions in *State v. Height*, *Wragg v. Griffin*, [185 Iowa 243, 170 N.W. 400 (1919)], and *State v. Weltha*, [228 Iowa 519, 292 N.W. 148 (1940)], defendant could not be compelled to submit to a blood test, that does not mean that his refusal to submit to it cannot be shown and considered. He cannot be compelled to testify. Yet his refusal to testify can be considered and commented upon. If he cannot be compelled to submit to a blood test, it is because he cannot be compelled to give evidence. But, since his refusal to give evidence by testifying can be considered, why cannot his refusal to give evidence by submitting to a blood test be likewise considered? We think that it can be.

*Id.* (citations omitted).

In support of its holding, the *Benson* court relied on the fact that the Iowa Constitution does not contain a provision prohibiting self-incrimination:

> Our constitution contains no express provision prohibiting self-incrimination. The only constitutional provision that would appear to guarantee such protection is the due process clause. The statute is Section 13890 of the Code, 1939, and

> provides as follows: "Defendants in all criminal proceedings shall be competent witnesses in their own behalf, but cannot be called as witnesses by the state." Defendant was not called as a witness by the state. He was not even called as such in his own behalf. The statutory prohibition was fully recognized. We then have the question remaining: Does the due process clause render the testimony of the deputy sheriff inadmissible? We answer: No. It is proper to show the defendant's conduct, demeanor and statements (not merely self-serving), whether oral or written, his attitude and relations toward the crime, if there was one. These are circumstances that may be shown. Their weight is for the jury to determine.

*Id.* (citation omitted).

After *Ferguson* and *Benson*, the United States Supreme Court began, through the process of selective incorporation, to constitutionalize criminal procedure and expand the Supreme Court's authority over state legal processes. *See Pointer v. Texas*, 380 U.S. 400, 409, 85 S. Ct. 1065, 1070 (1965) (Harlan, J., concurring in the result) ("The concept of Fourteenth Amendment due process . . . recognizes that our Constitution tolerates, indeed encourages, differences between the methods used to effectuate legitimate federal and state concerns . . . . The philosophy of 'incorporation,' on the other hand, subordinates all such state differences to the particular requirements of the Federal Bill of Rights and increasingly subjects state legal processes to enveloping federal judicial authority." (citations omitted)).

As part of the expansion of federal authority, in 1964, the Supreme Court held "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States." *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492 (1964). In the following year, the Court held "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either

comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233 (1965). *Griffin* specifically acknowledged Iowa had a different rule due to "[t]he absence of an express constitutional privilege against self-incrimination." *Id.* at 611 n.3, 85 S. Ct. at 1231 n.3.

Immediately after *Griffin*, this court was presented with the question of whether a district court erred in instructing the jury it could consider a defendant's failure to testify as "an inference of guilt." *Johnson*, 257 Iowa at 1055, 135 N.W.2d at 521. The court correctly concluded *Griffin* prohibited the instruction. In so doing, however, the court appeared to conclude *Griffin* changed Iowa constitutional law. *See id.* (stating "[a]lthough Iowa was listed as one of the six states which has no express constitutional privilege against self-incrimination or laws forbidding comment on failure to testify," the court "was constrained to follow" the change in law announced in *Griffin*). To the extent the *Johnson* court so concluded, its conclusion was in error. *See Brown*, 930 N.W.2d at 861 ("But this court's interpretation of the Iowa Constitution is not dictated by the Supreme Court's precedents under the incorporation doctrine of the Federal Constitution."); *Schmidt v. State*, 909 N.W.2d 778, 793 (Iowa 2018) ("Because we 'jealously' safeguard our authority to interpret the Iowa Constitution on our own terms, we do not employ a lockstep approach in following federal precedent although United States Supreme Court cases are 'persuasive.' " (quoting *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010))). *Griffin* changed only federal law and not state law. *See LaMar*, 260 Iowa at 969, 151 N.W.2d at 503 (recognizing "[t]he change brought about by Griffin gave defendant a federal constitutional right").

Even after *Griffin* and *Johnson*, this court continued to hold that the state could use the defendant's pretrial silence as substantive evidence of guilt and that the district court could provide instruction regarding the defendant's pretrial silence. In *State v. Myers*, the defendant was charged with committing "sodomy" on a child. *See* 258 Iowa 940, 942, 140 N.W.2d 891, 892 (1966). Upon being accused of the crime, the defendant remained silent, and the prosecutor introduced into evidence the defendant's pretrial silence. *See id.* at 948–49, 140 N.W.2d at 896. The district court instructed the jury "such silence may be considered along with all other evidence in determining the guilt or innocence of the defendant." *Id.* at 949, 140 N.W.2d at 896. This court distinguished *Griffin*, explaining that case dealt only with "comment by the prosecution on the accused's failure to *testify*." *Id.* at 950, 140 N.W.2d at 897 (emphasis added). The court reasoned that because the defendant had not asserted any right to remain silent, the "instruction did not penalize [the defendant] for his failure to speak out." *Id.* at 951, 140 N.W.2d at 898. Thus the court found the instruction was not "violative of the Fifth Amendment." *Id.* at 951, 140 N.W.2d at 897.

Later, in *State v. Holt*, the court reaffirmed the *Benson* rule post *Griffin*. *See* 261 Iowa 1089, 156 N.W.2d 884 (1968). The court noted, "For over 100 years it has been the law of Iowa that it is proper to show a defendant's conduct, demeanor, voluntary statements and attitude toward the crime." *Id.* at 1093, 156 N.W.2d at 886. The court reaffirmed that a defendant's pretrial "act of silence may be shown to the jury." *Id.* (quoting *Benson*, 230 Iowa at 1171, 300 N.W. at 277). The *Holt* court also affirmed that it was permissible for the district court to instruct the jury it could consider as substantive evidence of guilt what the "defendant did or refused to do or said" prior to trial. *See id.* at 1096, 156 N.W.2d at 888.

I need not belabor the point any further—textual differences between the Federal Constitution and the Iowa Constitution regarding the privilege against self-incrimination have resulted in different doctrine. The Iowa Constitution, as originally understood and applied for over 100 years, does not prohibit the district court from instructing the jury it may draw an adverse inference from the defendant's trial silence. In contrast, federal constitutional law prohibits this. The Iowa Constitution, as originally understood and applied for over 100 years, does not prohibit the district court from instructing the jury it may draw an adverse inference from the defendant's pretrial silence. In contrast, federal constitutional law appears unsettled. Admittedly, the differences in doctrine have been obscured by selective incorporation and the passage of time. But the differences in doctrine nonetheless remain.

## D.

Iowa has a rich constitutional history. We should no longer allow parties to obscure this rich constitutional history by raising a claim under the state constitution but then discussing only the federal standard on the assumption the standards are the same. Allowing the parties to continue to proceed in this manner is contrary to the adversarial process, is contrary to the rules of appellate procedure, and is bad substantive law. As Justice Stevens explained,

> "The right question," however, "is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The State's law may prove to be more protective than federal law. The state law also may be less protective. In that case the court must go on to decide the claim under federal law, assuming it has been raised."

*Massachusetts v. Upton*, 466 U.S. 727, 738, 104 S. Ct. 2085, 2091, (1984) (quoting Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 179 (1984)).

## II.

I next address Gibbs's facial challenge to the statute arising under the Federal Constitution. The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

By definition, "a necessary element of compulsory self-incrimination is some kind of compulsion." *Hoffa v. United States*, 385 U.S. 293, 304, 87 S. Ct. 408, 414 (1966). "As a general rule, compulsion is present when the state threatens to inflict 'potent sanctions' unless the constitutional privilege is waived or threatens to impose 'substantial penalties' because a person elects to exercise that privilege." *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 (Iowa 2011) (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 97 S. Ct. 2132, 2135–36 (1977)).

Section 704.2B(1), on its face, does not violate the Fifth Amendment because it does not compel anything. *See* Iowa Code § 704.2B(1)(2018). Section 704.2B(1), on its face, does not inflict any potent sanction or substantial penalty for the failure to notify law enforcement of the use of deadly force. Indeed, the statute does not impose any sanction or penalty for the failure to notify law enforcement of the use of deadly force. In the absence of "some kind of compulsion" the statute does not violate the Fifth Amendment. *See Hoffa*, 385 U.S. at 304, 87 S. Ct. at 414.

The lack of penalty or sanction in the statute distinguishes this case from the cases upon which Gibbs relies. In every case upon which Gibbs relies, the government sought to impose penalties or criminal sanctions for the failure to provide information to the government. *See, e.g., Grosso*

*v. United States*, 390 U.S. 62, 64–66, 72, 88 S. Ct. 709, 711–13, 715 (1968) (holding the defendant could not be prosecuted for the failure to pay the excise tax on gambling winnings); *Marchetti v. United States*, 390 U.S. 39, 60–61, 88 S. Ct. 697, 709 (1968) (vacating conviction where the defendant was convicted for failing to register and pay a tax on illegal gambling winnings); *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 75, 81, 86 S. Ct. 194, 197, 200 (1965) (setting aside registration orders where the challengers were subject to "very heavy penalties" and criminal sanction for the failure to register in accord with the orders issued by the board); *State v. Akins*, 423 P.3d 1026, 1034 (Idaho 2018) (holding the defendant could not be criminally prosecuted for her failure to notify law enforcement or the coroner of the death of another, the defendant's custody of the body, and the defendant's failure to preserve the body). Even then, some of the cases hold the imposition of criminal sanctions for the failure to provide information did not violate the Fifth Amendment. *See, e.g.*, *California v. Byers*, 402 U.S. 424, 433–34, 91 S. Ct. 1535, 1540–41 (1971) (holding no violation where the defendant was criminally prosecuted for the failure to stop and identify himself after being involved in a motor vehicle accident); *United States v. Sullivan*, 274 U.S. 259, 263, 47 S. Ct. 607, 607 (1927) (finding no violation where the defendant was convicted of willfully refusing to make a tax return as required by the Internal Revenue Code).

Even if the reporting statute contained a penalty provision, the statute, on its face, would not be unconstitutional. Reporting statutes of this type are deeply rooted in the common law and have been approved by the Supreme Court:

> Concealment of crime has been condemned throughout our history. The citizen's duty to "raise the 'hue and cry' and report felonies to the authorities," was an established tenet of

> Anglo-Saxon law at least as early as the 13th century. The first Congress of the United States enacted a statute imposing criminal penalties upon anyone who, "having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority . . . ." Although the term "misprision of felony" now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.
>
> This deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself.

*Roberts v. United States*, 445 U.S. 552, 557–58, 100 S. Ct. 1358, 1362–63 (1980) (alterations in original) (citations omitted) (first quoting *Branzburg v. Hayes*, 408 U.S. 665, 696, 92 S. Ct. 2646, 2664 (1972); and then quoting Act of Apr. 30, § 6, 1 Stat. 113 (current version at 18 U.S.C. § 4 (2018)). The federal statute criminalizing the failure to report the commission of a felony, enacted in the first Congress, remains good law. *See* 18 U.S.C. § 4. That statute punishes the failure to report the commission of a felony by a fine or a term of incarceration not to exceed three years, or both. *See id.*

For these reasons, I conclude the defendant failed to establish section 704.2B(1), on its face, violates the defendant's privilege against self-incrimination. The majority also appears to recognize the fatal defects in Gibbs's facial challenge to the statute. Rather than upholding the constitutionality of the statute, however, the majority chooses to "pass over" the issue. The majority's implicit concession on the constitutionality of the statute, however, undermines the remainder of the majority's rationale. If the statute is constitutional, and the majority does not hold otherwise, then the district court was required to instruct the jury on the applicable law.

III.

I next address Gibbs's contention that the district court's instruction regarding section 704.2B violated his Fifth Amendment right. The majority concludes the district court's instruction "imposes an improper penalty on the exercise of the constitutional right to remain silent." I respectfully disagree. The majority's conclusion that the jury instruction, standing alone, creates an unconstitutional compulsion is contrary to actual experience and historical understanding. The majority's penalty rationale is also contrary to the Supreme Court's most recent self-incrimination case, *Salinas v. Texas*, 570 U.S. 178, 133 S. Ct. 2174 (2013). Indeed, the majority's penalty rationale is contrary in some respects to each of the opinions in the *Salinas* case—the three-justice plurality opinion, the two-justice concurring opinion, and the four-justice dissenting opinion.

A.

As a matter of actual experience and historical understanding, both the criminal law and the law of evidence subject a criminal defendant to a strong compulsion to provide information to law enforcement after the commission of a crime because evidence of the failure to do so is relevant to the determination of guilt and admissible at trial. For example, our cases hold evidence of a defendant's failure to remain at the scene of a crime and a defendant's postoffense attempt to evade law enforcement is admissible and probative of guilt. *See State v. Wilson*, 878 N.W.2d 203, 211 (Iowa 2016) ("It is well-settled law that the act of avoiding law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself."); *State v. Seymore*, 94 Iowa 699, 707, 63 N.W. 661, 664 (1895) (approving a jury instruction that stated, "If you find from the evidence

that the defendant . . . fled to avoid arrest . . . such fact is a circumstance which prima facie is indicative of guilt").

We have also held a defendant's conduct, demeanor, and silence at the time of arrest or in the face of a criminal accusation is admissible and relevant to the determination of guilt. *See Schrier v. State*, 347 N.W.2d 657, 665 (Iowa 1984) ("We find the evidence of petitioner's demeanor and activities immediately following his son's injuries to be relevant and material to the jury's understanding of the events surrounding the victim's injuries. Such acts may provide a legitimate basis for inferring consciousness of guilt."); *State v. Canada*, 212 N.W.2d 430, 434 (Iowa 1973) ("It has been repeatedly held in this state that the admission of testimony as to the conduct of a defendant when first accused of a crime is not objectionable." (quoting *Myers*, 258 Iowa at 950, 140 N.W.2d at 897)); *Holt*, 261 Iowa at 1093, 156 N.W.2d at 886; *Benson*, 230 Iowa at 1171, 300 N.W. at 276–77; *State v. Pratt*, 20 Iowa 267, 269 (1866) ("It seems that there was testimony tending to show that the prisoner, when arrested, was charged with the theft and made no reply. . . . [W]hile this character of proof is often entitled to but little weight, there is no rule justifying its entire exclusion. Its value is to be determined by all the circumstances, of which the jury are the peculiar judges."); *State v. Jirak*, 491 N.W.2d 794, 797 (Iowa Ct. App. 1992) ("However, even if the issue of Sires's testimony concerning Jirak's silence had been correctly preserved, such testimony is proper and does not constitute error.").

Our caselaw is consistent with the law of other jurisdictions. More specifically, other jurisdictions agree the failure to report a shooting is relevant and admissible in homicide prosecutions where intent or justification is at issue. *See, e.g., People v. Halsema*, No. C077933, 2017 WL 1130927, at *11 (Cal. Ct. App. Mar. 27, 2017) (unreported); *Allen v.*

*United States*, 603 A.2d 1219, 1223 (D.C. 1992); *People v. Grimes*, 898 N.E.2d 768, 775 (Ill. App. Ct. 2008); *People v. Graham*, 279 N.E.2d 41, 43 (Ill. App. Ct. 1971); *Johnson v. Commonwealth*, No. 2007-SC-000612-MR, 2008 WL 4691694, at *6 (Ky. Oct. 23, 2008) (unreported); *State v. Patterson*, 63 So. 3d 140, 149–50 (La. Ct. App. 2011); *Commonwealth v. Morgan*, No. 599 WDA 2013, 2014 WL 10920399, at *9 (Pa. Super. Ct. May 23, 2014) (unreported); *Scott v. State*, No. 03-07-00654-CR, 2009 WL 416513, at *12 (Tex. Ct. App. Feb. 20, 2009) (unpublished).

While the admission into evidence of Gibbs's postoffense conduct, including his failure to report the use of deadly force, created a compulsion of a sort, it was not an unconstitutional compulsion. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 287, 118 S. Ct. 1244, 1253 (1998) ("[T]here are undoubted pressures—generated by the strength of the government's case against him—pushing the criminal defendant to testify. But it has never been suggested that such pressures constitute 'compulsion' for Fifth Amendment purposes."); *Carter v. Kentucky*, 450 U.S. 288, 306, 101 S. Ct. 1112, 1122 (1981) (Powell, J., concurring) ("But nothing in the [Self-Incrimination] Clause requires that jurors not draw logical inferences when a defendant chooses not to explain incriminating circumstances."); *Jenkins v. Anderson*, 447 U.S. 231, 243–44, 100 S. Ct. 2124, 2132 (1980) (Stevens, J., concurring) (explaining the admissibility of a defendant's prearrest silence is an evidentiary question and not a constitutional one). For example, in a very similar case, the Michigan Court of Appeals held a homicide defendant's privilege against self-incrimination was not violated by the prosecutor's arguments regarding the defendant's postoffense conduct:

> The prosecutor's comment that defendant fled the scene of the crime was proper commentary to support an inference of "consciousness of guilt." The prosecutor's comment that

> defendant waited a day before reporting the crime or turning himself in was proper commentary on defendant's failure to report a crime under circumstances under which it would have been natural to do so. The comment questioning why defendant failed to turn over the gun was proper because it referred to the weaknesses of the self-defense theory and referred to prearrest conduct. Moreover, because the prosecutor's comments attacked the credibility of the defense theory, the prosecutor did not impermissibly shift the burden of proof.

*People v. Camel*, No. 290270, 2010 WL 199612, at *3 (Mich. Ct. App. Jan. 21, 2010) (unpublished) (citations omitted) (quoting *People v. Goodin*, 668 N.W.2d 392, 396 (Mich. Ct. App. 2003)).

The majority agrees evidence of the defendant's failure to report the use of deadly force was relevant to the determination of guilt and admissible. The majority also agrees the prosecutor was free to argue the defendant's failure to report the use of deadly force supported an inference of guilt. The majority concludes, however, an instruction on the relevant law crosses the constitutional line. In other words, the majority's holding rests on the conclusions (1) that the district court's instruction creates some marginal compulsion above and beyond the strength of the State's evidence and (2) that the marginal compulsion is of sufficient magnitude to violate Gibbs's Fifth Amendment rights. On these points, I disagree.

First, the majority's conclusion that the jury instruction creates a marginal compulsion that rises to the level of unconstitutional compulsion seems far-fetched. The test for compulsion "is whether, considering the totality of the circumstances, the free will" of the party "was overborne." *United States v. Washington*, 431 U.S. 181, 188, 97 S. Ct. 1814, 1819 (1977); *In re Gault*, 387 U.S. 1, 47, 87 S. Ct. 1428, 1454 (1967) (stating the state compels evidence when, "whether by force or by psychological domination, [it] overcom[es] the mind and will of the person under investigation and depriv[es] him of the freedom to decide whether to assist

the state in securing his conviction"), *overruled on other grounds by Allen v. Illinois*, 478 U.S. 364, 365, 106 S. Ct. 2988, 2990 (1986).

The case for finding unconstitutional marginal compulsion is weak here. Here, the jury was instructed as follows:

> A person using deadly force is required to notify or cause another to notify a law enforcement agency about his use of deadly force within a reasonable time period after the use of the deadly force, if the Defendant or another person is capable of providing such notification.

Noticeably absent from the instruction is any suggestion from the district court that the jury could draw an adverse inference from the defendant's failure to report the use of deadly force. The district court's instruction allowed the parties to argue what inferences, if any, should be drawn from the defendant's failure to report the use of deadly force. It is hard to believe, as a factual matter, that after Gibbs shot and killed Wessels, Gibbs felt deprived of his "freedom to decide whether to assist the state in securing his conviction," *In re Gault*, 387 U.S. at 47, 87 S. Ct. at 1454, because he knew that if he was apprehended and charged with murder the district court might neutrally instruct the jury on the relevant law.

Second, the district court's provision of a jury instruction is not the kind of compulsion about which the founders were concerned. As will be discussed more below, this is the position of Justices Thomas and Scalia. *See Salinas*, 570 U.S. at 192, 133 S. Ct. at 2184 (Thomas, J., concurring); *see also Mitchell v. United States*, 526 U.S. 314, 331, 335, 119 S. Ct. 1307, 1316, 1318 (1999) (Scalia, J., dissenting) (stating "[a]s an original matter, it would seem to me that the threat of an adverse inference does not 'compel' anyone to testify," and "[o]ur hardy forebears, who thought of compulsion in terms of the rack and oaths forced by the power of law,

would not have viewed the drawing of a commonsense inference as equivalent pressure").

The majority's conclusion that the district court's instruction, standing alone, rises to the level of unconstitutional compulsion is contrary to actual experience and historical practice. Like Justices Thomas and Scalia, I conclude "our hardy forebears" would be shocked to learn the privilege against self-incrimination prevents the district court from instructing the jury on the relevant law and allowing the lawyers to argue the inferences to the jury.

B.

The majority opinion is also contrary to the Supreme Court's most recent articulation of the self-incrimination doctrine in *Salinas*. Because the majority opinion conflates separate issues, it is actually contrary in some respects to each of the opinions in the *Salinas* case—the three-justice plurality opinion, the two-justice concurring opinion, and the four-justice dissenting opinion.

1.

The majority opinion is contrary to the plurality opinion in *Salinas*. In *Salinas*, the defendant was charged with murder. 570 U.S. at 181, 133 S. Ct. at 2177 (plurality opinion). At trial, over the defendant's objection, the prosecutor used the defendant's prearrest silence as substantive evidence of the defendant's guilt. *See id.* at 182, 133 S. Ct. at 2178. The defendant was convicted of murder, and the state courts affirmed the defendant's conviction. The Supreme Court granted certiorari on the case to "resolve a division of authority in the lower courts over whether the prosecution may use a defendant's assertion of the privilege against self-incrimination . . . as part of its case in chief." *Id.* at 183, 133 S. Ct. at

2179. The Court found it unnecessary to address that question, however, "because [the defendant] did not invoke the privilege." *Id.*

The plurality opinion held the defendant's "Fifth Amendment claim fail[ed] because he did not expressly invoke the privilege against self-incrimination." *Id.* at 181, 133 S. Ct. at 2178. The Court reasoned,

> It has long been settled that the privilege "generally is not self-executing" and that a witness who desires its protection "must claim it." Although "no ritualistic formula is necessary in order to invoke the privilege," a witness does not do so by simply standing mute. Because petitioner was required to assert the privilege in order to benefit from it, the judgment of the Texas Court of Criminal Appeals rejecting petitioner's Fifth Amendment claim is affirmed.

*Id.* (first quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427, 104 S. Ct. 1136, 1141–42 (1984); and then quoting *Quinn v. United States*, 349 U.S. 155, 164, 75 S. Ct. 668, 674 (1955)). The Court concluded the government was free to make adverse use of the defendant's silence in the absence of express invocation. *See id.* at 186, 133 S. Ct. at 2180 (stating "the prosecution's use of [the defendant's] noncustodial silence did not violate the Fifth Amendment" because the defendant failed to invoke the right).

Here, as in *Salinas*, Gibbs never invoked his Fifth Amendment privilege against self-incrimination. The majority thus errs in concluding the district court's instruction imposed a penalty "on the exercise of the constitutional right to remain silent" when the defendant never exercised the right. The majority's opinion is directly contrary to the *Salinas* plurality's conclusion "that a witness must assert the privilege to subsequently benefit from it" and "that a defendant normally does not invoke the privilege by remaining silent." *Id.* at 186, 133 S. Ct. at 2181.

## 2.

The majority disregards the fact that Gibbs never exercised his constitutional right to remain silent and nonetheless holds the district

court's instruction "imposes an improper penalty on the exercise of the constitutional right to remain silent" because the defendant never had an opportunity to invoke the privilege. The majority notes it would be absurd to conclude Gibbs had a duty to call the police and say, "Hi, I'm Levi Gibbs, and I'm taking the Fifth." The majority also notes "[t]he only practical time to raise the Fifth Amendment was when the defendant did raise it, namely, at the jury instruction conference." The majority's holding and attempt to distinguish the *Salinas* plurality opinion highlight two deficiencies in the majority's rationale. The first factual. The second legal.

First, the majority's assertion that Gibbs did not have an opportunity to invoke the privilege prior to the jury instruction conference is factually incorrect and contrary to the record. Gibbs had multiple opportunities to invoke the privilege against self-incrimination prior to the instruction conference, and he failed to do so. On the day of September 4, Gibbs communicated with Detective Hedlund over the phone and by text multiple times throughout the day, but Gibbs never invoked the privilege. On the morning of September 5, Hedlund interviewed Gibbs for over two hours at Gibbs's residence, but Gibbs never invoked the privilege. On the afternoon of September 5, Hedlund interviewed Gibbs at the law enforcement center, but Gibbs never invoked the privilege. Instead of invoking his privilege on the multiple occasions he interacted with police officers, Gibbs chose to speak with the officers and provide them with false information regarding the shooting.

Second, the majority fails to contextualize the defendant's failure to report the use of deadly force and tease out the constitutional implications. In this case, the defendant's failure to report the use of deadly force arose in two contexts.

The first context was Gibbs's failure to report the use of deadly force—his silence—prior to his interaction with the police. Both the *Salinas* plurality and dissenting opinions conclude the adverse use and comment on a criminal defendant's silence prior to police interaction is not constitutionally protected. The *Salinas* plurality because the defendant never invoked the privilege.[9] The *Salinas* dissent because the defendant's silence in this context is an evidentiary question and not a constitutional question. *Salinas*, 570 U.S. at 198, 133 S. Ct. at 2187–88 (Breyer, J., dissenting). In reaching that conclusion, the *Salinas* dissent relied on *Jenkins*, 447 U.S. 231, 100 S. Ct. 2124. *Id.* In his dissenting opinion in *Salinas*, Justice Breyer explained *Jenkins* as follows:

> Jenkins killed someone, and was not arrested until he turned himself in two weeks later. On cross-examination at his trial, Jenkins claimed that his killing was in self-defense after being attacked. The prosecutor then asked why he did not report the alleged attack, and in closing argument suggested that Jenkins' failure to do so cast doubt on his claim to have acted in self-defense. We explained that this unusual form of "prearrest silence" was not constitutionally protected from use at trial. Perhaps even more aptly, Justice Stevens' concurrence noted that "the privilege against compulsory self-incrimination is simply irrelevant" in such circumstances. How would anyone have known that Jenkins, while failing to report an attack, was relying on the Fifth Amendment?

*Id.* (quoting *Jenkins*, 447 U.S. at 241, 100 S. Ct. at 2131 (Stevens, J., concurring in the judgment)). The dissenting opinion in *Salinas* specifically credited Justice Stevens' rationale regarding a defendant's

---

[9]The *Salinas* plurality does note there are two categories of exceptions to the requirement that a witness must invoke their right to remain silent for it to be triggered. *See* 570 U.S. at 184–85, 133 S. Ct. at 2179–80. While it is possible this case falls into the second category, the majority does not make that argument here. More important, if Gibbs's failure to report the use of deadly force falls within one of the recognized exceptions, the failure to report the use of deadly force is the constitutionally protected conduct. The majority never explains why the government can penalize the protected conduct by using it as substantive evidence of guilt and by allowing the prosecutor to argue adverse inferences from constitutionally protected conduct.

silence prior to police interaction. As Justice Stevens explained in *Jenkins,* "the admissibility of petitioner's failure to come forward with the excuse of self-defense shortly after the stabbing raised a routine evidentiary question that turns on the probative significance of that evidence and presented no issue under the Federal Constitution." *Jenkins,* 447 U.S. at 244, 100 S. Ct. at 2132. I agree with Justice Stevens' conclusion. The adverse use and comment on defendant's silence prior to any interaction with police is an evidentiary question and not a constitutional question.

The second context in which Gibbs failed to report his use of deadly force—his silence—was during his voluntary interviews with the police. As noted above, Gibbs was twice interviewed by the police, but he never invoked the privilege during these interviews. The failure to invoke the privilege during a police interview is the *Salinas* case. Under the *Salinas* plurality opinion, Gibbs's failure to report the use of deadly force during his multiple voluntary interviews with the police is not protected "because he did not expressly invoke the privilege against self-incrimination in response to the officer's question." *Salinas,* 570 U.S. at 181, 133 S. Ct. at 2178 (plurality opinion).

In sum, the majority's rationale that the district court's instruction violated the defendant's privilege against self-incrimination because the defendant never had the opportunity to invoke is not supported by the record or the law. With respect to Gibbs's failure to report the use of deadly force prior to his interaction with police, the *Salinas* plurality and dissent each conclude silence prior to police interaction is not constitutionally protected. In addition, the record shows the defendant had numerous communications with the police prior to his arrest, including phone calls, text messages, and two voluntary interviews. At no point during these voluntary police interactions did Gibbs invoke his privilege against self-

incrimination. The defendant's failure to invoke the privilege during these voluntary police interactions defeats his Fifth Amendment claim. *See id.* at 186, 133 S. Ct. at 2180 ("We have before us no allegation that petitioner's failure to assert the privilege was involuntary, and it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds. Because he failed to do so, the prosecution's use of his noncustodial silence did not violate the Fifth Amendment.").

3.

The majority disregards the fact that Gibbs never exercised his constitutional right and nonetheless holds the district court's instruction "imposes an improper penalty on the exercise of the constitutional right to remain silent" because the district court's jury instruction is a more significant penalty than allowing the prosecutor to make adverse use of the defendant's silence. In so concluding, the majority misapprehends the holding and rationale of the *Salinas* plurality and is contrary to the concurring opinion in *Salinas.*

The *Salinas* plurality did not turn on whether the government's adverse use of the defendant's silence was an unconstitutional penalty on his invocation of the privilege. Instead, it turned on the question of whether the defendant invoked his privilege at all. The majority's more-severe-penalty rationale conflates two separate issues—the defendant's silence and the defendant's invocation of his privilege against self-incrimination. *See id.* at 189, 133 S. Ct. at 2182–83 ("But popular misconceptions notwithstanding, the Fifth Amendment guarantees that no one may be 'compelled in any criminal case to be a witness against himself'; it does not establish an unqualified 'right to remain silent.' A witness' constitutional right to refuse to answer questions depends on his

reasons for doing so, and courts need to know those reasons to evaluate the merits of a Fifth Amendment claim."). The *Salinas* plurality holds the defendant's silence is not an exercise or invocation of the privilege against self-incrimination. Thus, under the *Salinas* plurality, adverse use of the defendant's silence, including an instruction on the same, does not constitute a penalty on the exercise of a constitutional right because the defendant never exercised the constitutional right. *See id.* at 186, 133 S. Ct. at 2180–81.

In addition to being contrary to the *Salinas* plurality opinion, the majority's more-severe-penalty rationale is also contrary to Justice Thomas's concurring opinion in *Salinas*. In *Salinas*, Justices Thomas and Scalia concurred in the judgment but not the plurality opinion. In their view, *Griffin*'s prohibition against an adverse inference instruction relating to trial silence "lack[ed] foundation in the Constitution's text, history, or logic" and for that reason should not be extended to pretrial-silence situations. *Id.* at 192, 133 S. Ct. at 2184 (Thomas, J., concurring in the judgment) (quoting *Mitchell*, 526 U.S. at 340, 119 S. Ct. at 1321 (Thomas, J., dissenting)). They specifically rejected the contention that a jury instruction allowing for an adverse inference to be drawn from the defendant's silence was unconstitutional. *See id.* (stating there is no constitutional compulsion "simply because a jury has been told that it may draw an adverse inference from [the defendant's] silence").

In my view, Justices Thomas and Scalia's position, as expressed in *Salinas*, is the superior understanding of the privilege against self-incrimination. Their understanding better reconciles constitutional text, the common law, and historical practice. Their understanding is consistent with the original understanding of the Iowa Constitution as expressed in *Height, Ferguson, Benson, Meyers*, and *Holt*—a defendant has

a right not to be compelled to provide testimony, but the right does not include a prohibition against the district court instructing the jury it may draw an adverse inference from the exercise of the right.

4.

Each of the majority's reasons for concluding the district court's instruction violated the defendant's privilege against self-incrimination are contrary to a majority of the Justices as expressed in the three opinions in *Salinas.* In this case, the defendant failed to voluntarily report his use of deadly force prior to being contacted by the police. His silence in that context is not constitutionally protected. He had multiple opportunities to invoke his privilege against self-incrimination during voluntary police interviews, and he failed to do so. In the absence of invocation of the privilege during these voluntary police interviews, the Fifth Amendment did not prohibit the district court from instructing the jury on the relevant law.

IV.

Because I conclude the defendant waived his state constitutional claim and failed to show a violation of his federal constitutional rights, I concur in the judgment.

Oxley, J., joins division I of this special concurrence.